CRAIG A. FOSTER & another[1] *vs.* FRANCIS BARTOLOMEO.

No. 90-P-411.

Middlesex. October 18, 1991. - November 26, 1991.

Present: KASS, GILLERMAN, & LAURENCE, JJ.

*Practice, Civil,* Findings by judge. *Contract,* Sale of real estate, Option. *Real Property,* Option. *Damages,* Breach of contract.

At the jury-waived trial of an action arising out of a letter agreement under which the buyers agreed to pay a certain sum for the option of purchasing "fifty-five (55) plus or minus acres of land and improvements" the evidence warranted the judge's determination that the description of the real estate in the letter agreement was sufficient to produce an enforceable contract with respect to the seller's entire fifty-seven and one-half acre holding, and that the seller had repudiated the contract. [594-595]

In an action for damages resulting from the seller's breach of a contract to sell certain real estate and improvements for $1,300,000, the buyers were entitled to recover $260,000, representing a net profit of twenty percent on the $1,300,000 the buyers had agreed to pay for the locus, rather than $575,000, the difference between the market value of $1,875,000 and the contract price of $1,300,000, where the judge, taking the buyers' testimony as the most persuasive evidence of their expectation from the contract, could decide that the difference between market price and contract price in this instance produced excessive damages. [595-596]

CIVIL ACTION commenced in the Superior Court Department on February 6, 1986.

The case was heard by *Robert J. Hallisey,* J.

*Jerry E. Benezra* (*Naomi G. Baline* with him) for the plaintiffs.

*Michael P. Angelini* (*Colleen C. Cording* with him) for the defendant.

KASS, J. Three questions were contested when this case was tried before a Superior Court judge sitting without a jury:

---

[1] William F. Dawson.

(1) whether the description of the real estate in the option agreement was sufficient to produce an enforceable contract; (2) whether Bartolomeo, the seller, had repudiated the contract; and (3) what were the damages. The judge found facts which established liability and assessed damages against the defendant Bartolomeo of $260,000. Judgment entered accordingly. Both sides were aggrieved by the judgment and appealed: the defendant because he was found liable and the plaintiffs because they thought the damages inadequate. We affirm.

Bartolomeo faces the formidable obstacle of demonstrating that the trial judge's findings of fact are clearly erroneous. Mass.R.Civ.P. 52, 365 Mass. 816 (1974). To overcome that obstacle he must persuade us to a firm conviction that a mistake has been committed. *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 620-622 (1985). On the contrary, we think the judge's findings of fact altogether supportable in the light of the record. We summarize those facts.

During the summer of 1985, the plaintiffs Foster and Dawson, who, under the business name Dawson Development Co., did real estate development work, expressed interest in Bartolomeo's property in Leominster, which consists of some fifty-seven acres, a residence, a farm stand, and a temporary greenhouse. This spread is known locally as "Bart's Farm." Some four meetings between buyers and seller culminated in a letter agreement dated August 8, 1985, under which the buyers agreed to "pay [Bartolomeo] $2,000/month for twelve months (or until we conclude a purchase and sale agreement, if earlier) for the option of purchasing your fifty-five (55) plus or minus acres of land and improvements for $1,300,000." That document, signed by Bartolomeo on August 9, 1985, acknowledged receipt by him of the first $2,000 monthly option payment.

Almost at once, Bartolomeo had second thoughts. His neighbor was selling land fronting on the same street at a much higher price. By October, Bartolomeo had repented of the bargain he had made with the plaintiffs to the point that

he declined to negotiate the check for the October option payment when the plaintiffs tendered it. Bartolomeo said that he wished to renegotiate the agreement and that he had come to understand that his property was worth at least $5,000,000. In November, 1985, and again in December, the plaintiffs tried to exercise their option by sending to Bartolomeo a draft purchase and sale agreement and a deposit check for $5,000. The plaintiffs did not hear from Bartolomeo but heard instead from his lawyer, who returned the $5,000 check as well as the checks for the October, November, and December option payments. Soon thereafter, on February 6, 1986, the plaintiffs filed a complaint which, as a primary category of relief, asked for specific performance.

1. *Liability.* As a defense, Bartolomeo's lawyers do what they can with the facts that the land under cultivation was shown on a plan as two lots, adding up to fifty-seven and one-half acres and that the option referred to fifty-five acres more or less. From this they attempt to deduce that the option applied only to the back land (some fifty-four acres) which Bartolomeo farmed, in part, and not to the lot fronting on Central Street, where a house and farm stand are located. The judge reasonably concluded that the description in the option letter was sufficient to encompass the entire Bartolomeo holding. Bartolomeo had acquired title to the over-all property by a single deed. The back land was landlocked, and it was scarcely plausible that the proposed buyers would part with $1,300,000 for land to which there was no access from a public street. Bartolomeo's reference to nearby properties fronting on public ways as a basis for his escalating asking price reinforced the judge in his conclusion that the option agreement referred to the entire Bartolomeo holding. Unlike the facts in *Michelson* v. *Sherman*, 310 Mass. 774, 777-778 (1942), the boundary lines of the locus were not in doubt.

In view of the return of the checks and the refusal to consider the proffered purchase and sale agreement, it was apparent that Bartolomeo was repudiating the option agreement. The buyers, therefore, did not have to go through the

sham of a tender. *Mayer* v. *Boston Metropolitan Airport, Inc.*, 355 Mass. 344, 354 (1969).

2. *Damages.* In arriving at damages of $260,000, the trial judge posited a net profit of twenty per cent on the $1,300,000 the plaintiffs had agreed to pay for the locus. That estimate had support in testimony of Craig A. Foster, one of the plaintiffs, who had said, "We would like to see a gross profit on a project of thirty percent. But that generally gets trimmed real fast with the off-site construction, which is a complete unknown going into the project." The plaintiffs would have the benefit of their bargain, the judge reasoned, that is, they should be as well off as they would have been had the contract been performed, if they received their antic-ipated profit margin, i.e., something less than thirty percent. Cf. *F.A. Bartlett Tree Expert Co.* v. *Hartney*, 308 Mass. 407, 412 (1941); *Ficara* v. *Belleau*, 331 Mass. 80, 82 (1954); *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.*, 362 Mass. 306, 310 (1972); *Laurin* v. *DeCarolis Constr. Co.*, 372 Mass. 688, 691 (1977); *American Mechanical Corp.* v. *Union Mach. Co.*, 21 Mass. App. Ct. 97, 101 (1985).

In the case of a breach of an agreement to sell real estate, the plaintiffs insist a more specific measure of damages has applied: the difference between the contract price and the market price of the property on the date of the breach. See *Capaldi* v. *Burlwood Realty Corp.*, 350 Mass. 765 (1961); *American Mechanical Corp.* v. *Union Mach. Co.*, 21 Mass. App. Ct. at 101-102; 5 Corbin, Contracts § 1098 (1964). The judge, adopting an opinion of fair market value offered by an expert witness, found that the defendant's land had a fair market value of $1,875,000 as of October 1, 1985, a date close to the date of breach. Urging application of the "usual rule" for nonperformance of a contract to sell real es-tate, the plaintiffs ask that the damages be established at $575,000, i.e., the difference between the market value of $1,875,000 and the contract price of $1,300,000.

The flaw in the plaintiffs' position is that the "usual rule" is not a rigid rule. As we called to attention in *American Mechanical Corp.* v. *Union Mach. Co.*, *supra* at 102, the

"usual rule" is only a variation on the theme of the dominant principle, that the injured party should be as well off as if the transaction had gone through — but not better off. Principles of contract damages do not have it as their design to put a plaintiff in a better position than if the defendant had performed the contract. *Ficara* v. *Belleau*, 331 Mass. at 82. *Louise Caroline Nursing Home, Inc.* v. *Dix Constr. Corp.*, 362 Mass. at 310. See also Restatement (Second) of Contracts § 351(3) and comment f (1979). In this case, the judge could take the buyers' testimony as the most persuasive evidence of their expectation from the contract and decide that the difference between market price and contract price in this instance produced excessive damages, even as in the *American Mechanical Corp.* case the orthodox formula had produced inadequate damages. See also *Neal* v. *Jefferson*, 212 Mass. 517, 522-523 (1912).

There is a further basis for the judge opting for the expectancy in favor of literal application of the "usual rule." It will be recalled that the plaintiffs had initiated their action with a prayer for specific performance. They abandoned that request for relief at the beginning of trial, on December 28, 1988. The judge could infer that owning the property for $1,300,000 no longer had magic for the plaintiffs and that basing damages on a substantially higher value might have produced distortional results. Having launched their action seeking equitable relief, the plaintiffs were subject to a determination of damages which would avoid inequity. See *Turner* v. *Guy*, 2 Mass. App. Ct. 343, 346 (1974).

There was no error in the determination of the contract damages.

*Judgment affirmed.*